## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| **JOHN DOE**, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| **K. MAYBURY**, a USP Thomson | ) |
| correctional officer; | ) |
| **D. CRUZE**, a USP Thomson | ) |
| correctional officer; | ) |
| **T. ALBERTSON**, a USP Thomson | ) |
| correctional officer; | ) |
| **C. BUNGARD**, a USP Thomson nurse; | ) |
| **K. MILLER**, a USP Thomson nurse; | ) |
| **C. HORST**, a USP Thomson nurse; | ) |
| **D. SWEENEY**, a USP Thomson nurse; | ) |
| **K. BICE**, a USP Thomson nurse; | ) |
| **DR. BOYD**, a USP Thomson doctor; | ) |
| **LT. BRULHE**, a USP Thomson | ) |
| correctional officer; | ) |
| **OFFICER JENKINS**, a USP Thomson | ) |
| correctional officer; | ) |
| **DONALD HUDSON**, | ) |
| Former USP Thomson Warden; | ) |
| **CHRISTOPHER RIVERS**, current | ) |
| USP Thomson Warden. | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

### Jurisdiction/Venue

1. This action is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*") to redress

Defendants' deprivation of the Plaintiff's rights as secured by the United States Constitution.

2. The Plaintiff was a former inmate at the United States Penitentiary Thomson ("USP Thomson") in Thomson, Carroll County, Illinois.

3. The Plaintiff, since the incidents that are the subject of this Complaint, has since been transferred to another USP facility in another state.

4. The jurisdiction of this Court is invoked pursuant to the judicial code 28 U.S.C. § 1331, and § 1343(a); the Constitution of the United States, and the Supreme Court's decision in *Bivens*.

5. Venue is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1402(b). On information and belief, the majority of the Defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within the district.

6. The Plaintiff has exhausted all available administrative remedies related to these incidents and/or such attempts were frustrated by the actions of prison officials.

### The Plaintiff's Background Relevant to this Incident

7. John Doe ("The Plaintiff") is 57 years old, and he is currently an inmate at a facility located outside the state of Illinois.

8. The Plaintiff is married, has three adult children, and had lived with his wife in his home state (not Illinois) before being sent to prison.

9. The Plaintiff is serving his federal prison sentence for bank robbery, not any type of sex offense.

10. However, in the 1980s, the Plaintiff was convicted of assault with intent to commit sexual assault.

11. Both the victim and the Plaintiff were teenagers at the time of the offense, and relatively close in age.

12. The Plaintiff was never required to register as a sex offender as a result of that incident or any other incident.

13. In March of 2014, the Plaintiff was sentenced to 12 years in prison.

14. The Plaintiff was originally sent to Allenwood USP in Allenwood, Pennsylvania to serve his sentence.

15. The Plaintiff was beaten by inmates in Allenwood, and as a result he was re-designated to Coleman II USP in Coleman, Florida.

16. Coleman II was a so-called "special needs yard" for people who need protection, and thus, for his safety, per Bureau of Prison ("BOP") regulations, he should not be placed on a so-called "active yard," *i.e.* in general population.

17. While he was at Coleman II, due to the Plaintiff being in possession of suboxone, a drug used to treat opioid addiction, he was then transferred as punishment to the Special Management Unit ("SMU") at USP Thomson.

18. The SMU is filled with prisoners who are either being disciplined but are not dangerous, or are designated as dangerous inmates, and/or both.

19. The Plaintiff was not a dangerous inmate, but was there only because he was being disciplined for being in possession of suboxone.

## Officer Maybury Notifies Everyone on the Plaintiff's Living Unit that the Plaintiff is a "Cho Mo," a Derisive Name for a Child Molester

20. On or about October 2 or 3, 2019, the Plaintiff was sent to Thomson USP.

21. The Plaintiff's first cellmate was an inmate named Yates.

22. About two weeks after his arrival, the Plaintiff came back from the yard, and his cell was tossed by staff, and Yates asked Officer K. Maybury why this occurred. Officer Maybury, in response, yelled out to the inmates on the living unit that this only occurs to cops, snitches, and rapists, and asked the Plaintiff, "which one are you?"

23. When Officer Maybury loudly asked this question, he was making the implication to the other inmates that the Plaintiff was in one of those disfavored categories.

24. Within about a week, a bus of new arrivals came to the prison. Officer Maybury told the inmates on the Plaintiff's unit that there were a bunch of "cho mos" and "hot guys" on the bus, and that they need to "clean up their car."

25. A "cho mo" is a known nickname at Thomson for child molesters, and is a phrase used regularly and openly by Officer Maybury to refer to alleged sex offenders at the SMU.

26. It is believed that "hot guys" means "snitches," and the phrase "clean up the car" refers to the particular inmate "shot callers" in charge of their informal

groups needing to clean up their "car," meaning they should rid themselves of these undesirable inmates.

27. After these announcements by Officer Maybury, Yates asked the Plaintiff whether he was a child molester. The Plaintiff denied he was a child molester, and Yates then told the Plaintiff that "they [the guards] are saying you are," that their cell kept getting "tossed" (searched) as a result, and that Yates was going to beat the Plaintiff because of this.

28. Yates explained to the Plaintiff that when he was talking to one of the "shot callers," this "shot caller" told him he was shown a clipboard by Officer Maybury of all of the inmates on the living unit who were "no good."

29. Yates told the Plaintiff that his name was on that list.

## Officer Maybury was Put on Notice about Cellmate's Threats/Beat the Plaintiff in Retaliation

30. On November 23, 2019, the Plaintiff was being escorted from his cell when he informed a female officer (described as White, with brunette hair) who was escorting him that he could not return to his cell because if he did, Yates told the Plaintiff he "would have to hurt me really bad."

31. This female officer, in turn, told Officer Maybury about the threat from Yates, but this, unfortunately, was the same officer who caused the Plaintiff's problems.

32. In response, Officer Maybury told the Plaintiff either go back to his cell and "fight it out" with Yates, or "deal with me."

33. The Plaintiff asked Officer Maybury if he could speak with a supervisor, but Officer Maybury refused, and instead he told the Plaintiff to cuff up.

34. The Plaintiff refused to go back to the cell out of fear of his safety.

35. Officer Maybury told the Plaintiff that he was either going to be beaten by his cellmate or by him, and in response the Plaintiff told Officer Maybury he just didn't want any problems.

36. Officer Maybury told the Plaintiff he was not going to allow the Plaintiff to switch cellmates because "this is what happens to 'cho mos.' "

37. Officer Maybury told the Plaintiff to lay face down on the ground, which he did.

38. Officer Maybury then left the Plaintiff in the room, and the Plaintiff got up.

39. When Officer Maybury returned, he asked the Plaintiff again whether he was willing to go back to the cell, and again the Plaintiff refused due to his fear of his cellmate.

40. Officer Maybury told the Plaintiff to get on the ground again, which he did.

41. Then, while laying face down on the ground, Officer Maybury began to beat the Plaintiff and spray OC in his face, and pressed the code while he was doing this.

42. The other officers, which included Officer Jenkins (a White male officer, covered in tattoos) then came into the room, and jumped on the Plaintiff, placed him in ambulatory restraints, and then he was brought to the medical unit.

43. The Plaintiff was treated for his injuries that morning, at about 11 a.m. and expressed concern for his safety from being assaulted by staff.

44. Thereafter, at 11:53 a.m., Officer Maybury wrote a false report in an attempt to explain the Plaintiff's injuries.

45. In that false report, Officer Maybury claimed at 9:53 a.m., he attempted to apply hand restraints to the Plaintiff in Shower D, Range 2, G Unit, and there and then the Plaintiff allegedly refused to submit to handcuffing and told Officer Maybury that if he is forced to go back to his cell he was going to kill himself. Officer Maybury then claimed the Plaintiff positioned his body face down and began to strike his own head on the floor. Officer Maybury then claimed he used OC spray on the Plaintiff, which proved ineffective, and the Plaintiff continued to strike his head on the floor. Officer Maybury then claimed he used OC a second time, which succeed in gaining compliance.

46. Officer Maybury submitted this false report to cover up his own use of excessive force, as the Plaintiff never threatened suicide, and never harmed or threatened to harm himself. Instead, all of the injuries suffered by the Plaintiff that morning were the result of excessive force committed by Officer Maybury and other officers, including Officer Jenkins.

### Prison Psychiatrist Dr. Levy Interviews the Plaintiff and She Realizes He is Not Suicidal and is Instead the Victim of a Beating by the Prison Guards

47. After being sent to the medical unit, the Plaintiff was returned back into the observation unit and kept there in ambulatory restraints.

48. While in the observation room, the Plaintiff was visited by Dr. Levy, who upon information and belief is the prison psychologist.

49. Dr. Levy pulled the Plaintiff out of this room, and she interviewed the Plaintiff in private.

50. Dr. Levy, following up on the false report submitted by Officer Maybury that the Plaintiff was suicidal (in actuality, this report was written as an attempt to cover up the guards' beating of the Plaintiff) asked the Plaintiff whether he was suicidal. The Plaintiff responded that he was not, and that he was instead beaten by Officer Maybury and the other officers.

51. Dr. Levy seemed sympathetic to the Plaintiff's situation, and even told the Plaintiff that she witnessed Officer Maybury taunt the Plaintiff while he was in the observation room.

52. Dr. Levy also knew there may likely be a disciplinary hearing about this incident, and she volunteered to go to his hearing as a potential witness, which she later did, although the reports obtained by the Plaintiff do not specify what she said at this hearing.

53. Dr. Levy, upon information and belief, knew the Plaintiff was not suicidal or at risk to self-harm and would have notified prison staff, including high-ranking supervisors about this conclusion.

### Officer Maybury and Other Prison Guards Take the Plaintiff out of the Observation Room and Beat Him Again

54. At about 6 p.m. that night, Officer Maybury, along with a group of other officers that also includes Officer D. Cruze and Officer T. Albertson, came into the observation cell.

55. Upon information and belief, a lieutenant was part of this group of officers.

56. The officers took the Plaintiff out of his ambulatory restraints, stood him up, re-cuffed him behind his back in black-box handcuffs, and placed him in a wheelchair.

57. While in the wheelchair, Officer Maybury told the Plaintiff he needs to go back to his cell, but the Plaintiff continued to plead with Officer Maybury that he cannot do this because it would be too dangerous.

58. In response, Officer Maybury told the Plaintiff he knew the Plaintiff sexually assaulted a 13-year-old girl, and that he was on the sex offender registry in Illinois, which was false, as the complainant in that case from the 1980s was not 13 years old, and he never lived in Illinois.

59. The Plaintiff disputed this information, and again requested protection, which was ignored.

60. The Plaintiff asked where he was going, and Officer Maybury responded that he was "going back to get your ass kicked, 'ch mo.' "

61. As they were wheeling the Plaintiff outside, the Plaintiff's feet were being dragged on the concrete.

62. The Plaintiff did not have any shoes or sandals on at the time, and it was very cold outside, as this occurred in late November, at night.

63. While the Plaintiff was in the wheelchair, one of the officers stabbed the Plaintiff with a sharp object, causing the Plaintiff to fall out of the wheelchair.

64. Once out of the wheelchair, Officers Maybury, Cruze, Albertson, and other officers pounced on the Plaintiff and then put him back in the wheelchair.

65. At about 7:30 p.m. that night, according to medical records, a nurse noted injuries to the Plaintiff's toes, wrist, and knee.

66. Twenty minutes later, at 7:50 p.m., Officer Cruze wrote a false report in an attempt to cover up the officers' use of excessive force committed by these injuries.

67. Officer Cruze wrote in his report that at about 6:05 p.m., Plaintiff suffered his injuries while being escorted in a wheelchair on the south compound walk area, and that the Plaintiff "threw his body out of the wheelchair," which was a lie, since the officers were the ones who forced his feet to drag on the concrete and it was the guards who threw him out of the wheelchair and beat him.

**Returning of the Plaintiff to the Observation Room and placing him in Four-Point Restraints**

68. The officers took the Plaintiff back to the observation cell, and these officers, including Officers Maybury, Cruze and Albertson, put him in four-point restraints, purely to cause the Plaintiff pain, for retaliatory reasons, and also to cover up their own misconduct.

69. The Plaintiff was in obvious pain and distress, crying, and begging for help and repeatedly requesting to be taken out of the painful and uncomfortable four-point restraints.

70. All of the officers, including Officers Maybury, Cruze, and Albertson, ignored these requests for help.

71. Instead, the officers left the Plaintiff in that position to suffer the entire night and morning.

## The Plaintiff Suffered a Night and Morning of Torture while in Four-Point Restraints

72. Placing an inmate in four-point restraints is one of the most extreme restraint measures used in the federal prison system, although the Plaintiff argues that this BOP practice is a Medieval torture practice that should be banned in all prisons, for any reason, forever.

73. Both inmates and guards at Thomson call the room where the four-point restraints were applied "the torture room," this room is routinely used to at Thomson to retaliate against inmates for making complaints, and has been the subject of numerous internal grievances and federal lawsuits in the Northern District of Illinois, Western Division.

74. To the extent that this practice was allowed in 2019, and to the extent that it is still may be allowed today, it is only to be used in extreme circumstances, with extremely specific criteria being met, and it certainly cannot be used as a means of retaliation, as was the case here, and as is the case with numerous other inmates at Thomson as well.

75. The use of four-point restraints by federal correctional officers and medical professionals is regulated by 28 CFR § 552.24.

76. Even under the guards' false version of events, the use of four-point restraints was in direct violation of Section 552.24 in several respects, but it certainly was not proper based on what truly happened, *i.e.* it was used as retaliation and to cover up official misconduct.

77. To effectuate this so-called "four-point restraint" method of restraint, the guards laid the Plaintiff on a concrete bed on his back, then handcuffed and chained all four of his limbs to the bed, in a spread-eagle position. While in this position, the Plaintiff could not move at all, not even to scratch himself.

78. Upon information and belief, the Plaintiff was in this position from roughly 7 p.m. to noon the next day, a total of approximately 17 hours.

79. Throughout the course of the night and morning, nurses would periodically come into the room, but otherwise, neither the guards nor the nurses actually released the Plaintiff from his painful position, even to stretch, scratch or use the bathroom, and they did nothing to relieve the pain caused by the tightly applied handcuffs.

80. The Plaintiff needed to use the restroom throughout this time period, but both the guards and the nurses refused these requests, and the Plaintiff urinated on himself as a result, causing extreme physical discomfort and mental anguish.

81. Among the nurses who came into the room and were deliberately indifferent to the Plaintiff's requests for medical assistance, to use the bathroom, and/or alleviation of severe physical and mental discomfort were Nurses C. Bungard and K. Miller, whose deliberate indifference were a proximate cause of the injuries to the Plaintiff.

82. Additionally, during this time period, Dr. Boyd, upon information and belief, was or knew he should have been monitoring the use of four-point restraints and the Plaintiff's medical care, but he was deliberately indifferent to the nurses and guards providing the proper medical and mental health care, and their violation of the dictates of Section 552.24.

83. The result of Dr. Boyd's deliberate indifference to the serious physical and psychological needs of the Plaintiff were a proximate cause of the injuries to the Plaintiff.

84. Throughout the time period, guards would also come into the cell while the Plaintiff was in the four-point restraints, and they would use their shields to physically abuse the Plaintiff, even though he was completely defenseless and not in any way a danger to himself or others.

85. The use of shields to cause gratuitous pain to the Plaintiff was part of a pattern of practice of officers at Thomson using their shields as weapons to inflict pain on inmates while they are in this defenseless position. The Plaintiff was one of many who have been subject to such abuses.

86. The guards would periodically use their shields and/or fists to cause injury to the Plaintiff's face and body, including the use of excessive force to his penis and testicles.

87. One of the officers who used excessive force/battery was Lt. Brulhe, including the use of excessive force to the Plaintiff's penis and testicles.

88. Lt. Brulhe participated in the use of excessive force during the period of time when the Plaintiff was in four-point restraints, observed other officers using excessive force, and was a supervisor in charge of those officers, but failed to intervene to prevent this use of excessive force from occurring and/or turned a blind eye or condone such misconduct.

89. Lt. Brulhe also knew the Plaintiff was physically and mentally being tortured and was in urgent need of medical care, yet he failed to intervene to prevent this deliberate indifference to his serious medical needs and/or he turned a blind eye or condones such misconduct.

90. Being subjected to this sort of extended physical and psychological torture caused the Plaintiff physical pain and suffering, and extreme, permanent mental anguish.

91. Being subjected to the extended use of four-point restraints also caused the Plaintiff permanent physical injuries, *i.e.* nerve damage to his right hand/wrist.

92. As a result of the officers, including Lt. Brulhe, hitting the Plaintiff's penis and testicles with a shield, the Plaintiff was later diagnosed with Peyronies Disease.

93. Symptoms of Peyronies Disease include having a bent/curved penis, lumps in the penis, painful erections, soft erections, and difficulty having sex because of the bent/curved penis.

94. The Plaintiff never suffered from these symptoms before this blunt force trauma.

95. After this incident, however, the Plaintiff suffered symptoms such as deformation of the penis and other symptoms consistent with this disease.

96. One of the known causes of Peyronies Disease is blunt force trauma.

97. Upon information and belief, the Plaintiff's Peyrnoies Disease was caused by the blunt force trauma employed by the officers.

98. The application of the four-point restraints and the method in which it was conducted constituted excessive force and deliberate indifference to the serious medical needs of the Plaintiff; but it also specifically violated Section 552.24.

99. Aside from the fact that torture procedure should not have been used in the first place because the Plaintiff was not in danger of self-harm, this section was violated in many other ways, including but not limited to: there was no exhaustion of prior alternatives before using this extreme technique; there was no indication it was proven ineffective during the initial procedure; the bed was not covered with a mattress and there was no blanket; both guards

and nursing staff did not conduct adequate period checks for the Plaintiff's health and safety; he was never rotated for comfort; he was not afforded the opportunity to use the toilet and ended up urinating on himself.

100.    Moreover, the application of the cuffs was excessive and no attempt was made to alleviate the pain, and, since the procedure lasted longer than 8 hours, there was no attempt by the Warden or other equivalent representative to approve of the continued use of this procedure, as required by Section 552.24.

101.    The individuals who were present during the misuse of the four-point restraints and the use of excessive force during this torture session and were deliberately indifferent to the serious medical needs of the Plaintiff include Lt. Brulhe, Dr. Boyd, Nurses C. Bungard and K. Miller.

102.    Maybury, meanwhile was a proximate cause of the Plaintiff being placed in four-point restraints and the damages that resulted therefrom because he lied in official reports and to supervisors, falsely claiming the Plaintiff was self-harming when, in fact, the Plaintiff's injuries were caused by Maybury's excessive use of force.

103.    Officers Cruze, Jenkins, and Albertson, meanwhile, also knew the Plaintiff was not suicidal and that he was the victim of excessive force, and thus they also are a proximate cause of the Plaintiff being placed in four-point restraints and the damages that resulted therefrom.

104.     Upon information and belief, Warden Hudson knew prior to this incident that the four-point restraints were being systematically used, not only in violation of Section 552.24, but also in a manner that was not only regularly violating inmates' rights to be free from excessive force, but that also resulted in deliberate indifference to their serious medical, including psychological needs, yet he did nothing to stop the practice.

105.     Upon information and belief, these sorts of violations of Section 552.24 were routine, and continue to be routine, and Wardens Hudson and Rivers were deliberately indifferent in failing to monitor to correct the practice.

106.     For example, at least three other civil lawsuits have been filed in the Northern District of Illinois by Thomson inmates who allege similar treatment by officers and medical staff and blatant violations of Section 552.24. These lawsuits all include K. Maybury as defendants. These cases are *Thomas Chamblis Jr. v. United States*, 21 CV 50126; *Joseph Vansach v. K. Maybury*, 20 CV 50180; and *Landis v. Murton*, 19 CV 50257 (the Plaintiff specifically asked for an injunction against Thomson's routine misuse of four-point restraints).

107.     The Plaintiff's attorney is also aware of other inmates who have not filed lawsuits, but who have been subject to similar abuse, and these inmates confirm both staff and inmates call the room where the four-point restraint technique as "the torture chamber."

## Placing the Plaintiff Back in His Cell After the Officers Knew the Plaintiff was in Danger

108.    On November 24, 2019, after his night and morning of torture, when a group of different officers told the Plaintiff he needed to go back to his cell, he initially protested, telling them about the threats made against him by his cellmate.

109.    In response, these officers told the Plaintiff "we don't do that here," and instead the officers suggested that the Plaintiff start a fight with his cellmate to get a different cellmate, just as Officer Maybury suggested the previous day.

110.    However, the Plaintiff did not want to start a fight, did not want to get punished, and did not want to do anything to cause him to stay at Thomson longer than he needed to be, and fighting would certainly cause him to be punished and to stay longer at Thomson.

111.    The Plaintiff initially refused the officers' suggestion, but after about two hours, the officers returned, and the Plaintiff agreed to their plan, as he was convinced it would be worse for him if he stayed with his cellmate, and this appeared to be the only way out.

112.    The officers told the Plaintiff that they found him a new cellmate, who was supposedly and older Mexican man who would not hurt him.  The Plaintiff was very happy when the officers told him this, and now he did not believe that he would need to start a fight to get moved, since he did not believe this cellmate would hurt him.

113.     Instead, when the guards returned the Plaintiff to his cell, he met his new cellmate, Fernandez, who was a 30-year-old active gang member, who immediately told them, "I don't want this 'cho mo' in here."

114.     Upon information and belief, Fernandez, like all the other inmates on the unit, got this information from Officer Maybury's reckless and/or intentional notification of the inmates on the living unit that the Plaintiff was a "cho mo" and/or on a list of persons who needed to be punished.

115.     The Plaintiff turned around and begged the officers to be moved.

116.     Fernandez saw that the Plaintiff was injured, and he told the officers he believed they were setting him up to take the blame for his injuries.

117.     The officers told Fernandez that they know he did not cause the injuries to the Plaintiff, but that he must stay with him in the cell.

118.     Fernandez told the guards that he was going to hurt the Plaintiff, and the officers told them to "go ahead."

119.     When the officers left, the Plaintiff had to get on his knees and beg his new cellmate not to beat him, and the Plaintiff even arranged a phone call with his wife to assure Fernandez that he was a bank robber, not a child molester.

120.     Thankfully, this individual did not hurt the Plaintiff, although being placed back in his cell with this cellmate did cause him severe emotional anxiety.

121.    The next day, the Plaintiff received a new cellmate, and with this inmate, Jorge Ponce, the threats turned to actual violence, including repeated sexual assaults.

### Repeated Sexual Assaults by Cellmate Ponce

122.    Jorge Enrique Ponce, Register Number 43353-177, was a gang member from Texas.

123.    Ponce was one of the inmates on the Plaintiff's living unit who was notified by Officer Maybury that the Plaintiff was allegedly a "cho mo."

124.    Almost immediately, Ponce told the Plaintiff that he was in charge of the cell, not the Plaintiff, that he knew the Plaintiff was a "cho mo," and that he would not beat him as long as he agreed to do whatever Ponce wanted him to do.

125.    Ponce was first placed in the Plaintiff's cell on November 25, 2019.

126.    Ponce would masturbate in the presence of the guards, and was known by the guards on the living unit to be a sexually dangerous deviant.

127.    The guards also knew Ponce would smoke K-2/Spice, a synthetic form of marijuana not allowed in the prison, and that when he smoked K-2/Spice, he would get revved up, and take it out on the Plaintiff.

128.    Ponce sexually assaulted the Plaintiff, orally and anally, two or three times a week for over a month.

129.    Upon information and belief, the guards knew about the sexual assaults and/or potential danger of sexual assault from Ponce's overt behavior in front of the guards, and yet the guards did nothing to stop these actions.

130.    Ponce would normally not ejaculate inside of the Plaintiff. However, on January 4, 2019, he did, and the Plaintiff smeared it onto his underwear and hid the underwear.

131.    The next morning, the Plaintiff snuck a note to the nurse telling her his blood pressure might need to be checked, and in small words, he wrote, "Please help me, I'm being sexually assaulted."

132.    The Plaintiff waited to notify staff of the sexual assaults because, not only did it appear to the Plaintiff that the guards were ignoring Ponce's obvious sexual deviancy, but based on his past experience with correctional staff, he knew his complaints would not be taken seriously, and that he needed to have proof.

133.    Without such proof, the Plaintiff reasonably believed, the Plaintiff was convinced that if Ponce found out about any sort of outcry, he would kill or seriously hurt him.

134.    On January 6, 2020, at 1:27 p.m., the Plaintiff was treated as a result of the injuries he suffered from a sexual assault. The Plaintiff indicated to the nurse that he was sexually assaulted in his cell, G Unit, Range 2, Cell 40. The nurse noted in her medical record that the Plaintiff had a bleeding rectum,

and that he had been penetrated by his cellmate, orally and anally. He appeared anxious and distressed, she noted.

135.     The nurse documented that the Plaintiff told her that he had been subjected to repeated sexual assault by his cellmate for the last month, and that the last sexual assault occurred on January 4, 2020.

136.     The Plaintiff told the nurse about the ejaculate on his second pair of boxer shorts he was wearing at the time of the examination.

137.     An officer placed these ejaculate-stained boxer shorts into an evidence bag, according to the medical records.

138.     Even though the Plaintiff was assured that this matter would be investigated, upon information and belief, it was not, as the Plaintiff has been given no indication whatsoever that an investigation into these criminal matters at the prison was ever even begun.

139.     As an example of the absurdly dysfunctional mismanagement at Thomson – and the lack of serious interest in investigating officer and inmate-on-inmate misconduct – it should be noted that one of the officers who committed serious misconduct in this case is Officer D. Cruze.

140.     Officer D. Cruze is related to and has the same unique last name as the Special Investigative Supervisor ("SIS") in charge of investigating officer and inmate misconduct and facilitating or initiating criminal investigations of officers and inmates.

141.     Moreover, this SIS relative's wife (also with the unique name Cruze) also works at the prison, and she is involved in the processing of prison grievances, a necessary first step under the Prison Litigation Reform Act before prisoners in custody can file lawsuits.

142.     Any warden who was serious about taking prisoner grievances and criminal misconduct seriously would find this situation intolerable, yet Wardens Hudson and Rivers allowed this situation to exist nonetheless.

143.     The sexual assault of the Plaintiff is the proximate cause of Officer Maybury recklessly and/or intentionally notifying inmates in the unit that the Plaintiff was a "cho mo," and also the manner in which prison officials were deliberately indifferent to the Plaintiff's risk of sexual assault.  Additionally, the prison officials' turning a blind eye to the sexual assault once they were made aware of a specific outcry, coupled with potential DNA evidence as proof, was in direct violation of the Prison Elimination Rape Act standards, a federal regulation that must be followed by the federal officials in this case.

144.     Rather than comply with PERA standards and investigate the sexual assaults, instead, prison officials merely transferred Ponce to another cell in the same living unit, and transferred a cellmate from that cell to the Plaintiff's cell.  That new cell mate, Rami Saba, did not repeatedly rape the Plaintiff, but he did beat and terrorize the Plaintiff.

**Threats and Beatings by Rami Saba, the Refusal By Lt. Bruhle to Move the Plaintiff to a Place of Safety, and the Thomson Policy or Practice of Refusing to Document and Treat Injuries Without the Permission of a Correctional Supervisor**

145.     Rami Ikbal Saba, Register Number 13512-040, was convicted of a murder-for hire plot, and the body of the victim has never been found.

146.     Saba did not initially threaten the Plaintiff. However, Saba and the Plaintiff did not get along, and there was increasing tension between the two.

147.     Saba began to threaten the Plaintiff, putting the Plaintiff in a constant state of fear.

148.     On or about early to mid February of 2020, Saba beat the Plaintiff, causing him to have two black eyes.

149.     The day after, the Plaintiff told Lt. Bruhle and nursing staff about the injuries, and other correctional officers also pointed out these injuries to Lt. Bruhle.

150.     The Plaintiff requested to be put in a safe cell or that Saba be moved, but Lt. Bruhle refused.

151.     The Plaintiff asked that his injuries be treated and documented, and several nurses and Lt. Bruhle refused these requests.

152.     Nurses C. Horst, D. Sweeney, and K. Bice all refused to document and treat the injuries, which included two obvious black eyes and a split lip.

153.     Nurse Sweeny told the Plaintiff that nurses needed the permission of a lieutenant to document any injury.

154.     However, Lt. Bruhle refused this request, and thus the injuries were not documented or treated.

155.     Saba himself in letters sent to the Plaintiff's wife and lawyer, Richard Dvorak, acknowledged the Plaintiff had black eyes, but Saba claimed in the letters that they were self-imposed, which was a lie.

156.     Importantly, however, Saba also acknowledges in those letters that he was present when the nursing staff repeatedly refused to note his injuries.

157.     In the letter Saba wrote the Plaintiff's wife, Saba admitted that, in Saba's presence, the nurses told the Plaintiff, "it's up to the Lt." to document the injuries.

158.     In the letter to the Plaintiff's attorney, Richard Dvorak, Saba similarly wrote the nurses refused to document the injuries, and that one of the nurses, in his presence, "replied they couldn't unless solicited by the Lt. in charge."

159.     These two letters, written by the man who beat the Plaintiff, thus corroborated the Plaintiff's claim that the prison has an official or unofficial policy of not allowing medical staff to document injuries without the permission of a lieutenant, which, in this case, was refused by Lt. Bruhle.

160.     Alternatively, Lt. Bruhle, on his own, told the nurses that they could not document or treat the Plaintiff's injuries, thus interfering with the Plaintiff's medical treatment, and/or the nurses and Lt. Bruhle used this as an excuse not to treat and document the Plaintiff's injuries.

**Officer Cruze Ignoring and/or Encouraging Saba to Commit Violence Against the Plaintiff and Officer Maybury Further Inflames the Danger to the Plaintiff**

161.     Some time after the beating, correctional officers were passing out razors, and Saba told the Plaintiff that when he gets a razor, he was going to hurt the Plaintiff.

162.     The Plaintiff gave a slip warning of the threat to the officer passing out the razors, who turned out to be Officer Cruze, the same officer who participated in his earlier beating, but instead of taking the threat seriously, Officer Cruze asked Saba if he wanted some clippers, and that he should "do what you got to do."

163.     Luckily, Officer Cruze's reckless endorsing of violence did not cause Saba to use the clippers, but it did cause the Plaintiff further severe emotional distress.

164.     On February 19, 2020, the Plaintiff saw Officer Maybury for the first time since the November 23, 2019 incident.  On that day, he saw the Plaintiff in the shower, then told him, "Oh, the 'cho mo'. Don't let me see you banging your head on the floor."  This statement was said in front of numerous inmates, and the entire living unit erupted with chants of, "kill the 'cho mo'.

165.     The Plaintiff was caused further severe emotional distress as a result of these actions.

166.     Even though Lt. Bruhle and Officer Cruze were put on notice that Saba was a danger to the Plaintiff, Saba continued to beat the Plaintiff thereafter.

167.     Saba was enabled and encouraged to beat the Plaintiff, regularly, because he knew that he would not suffer any consequences if he did so, and that the Plaintiff would not be able to get treatment or documentation of such injuries, since Lt. Bruhle, C. Horst, D. Sweeney, and K. Bice all refused to treat and document the Plaintiff's injuries from Saba's prior beating of the Plaintiff.

168.     Upon information and belief, Thomson had an official policy and/or custom or practice of not documenting and treating injuries unless approved by a correctional staff supervisor, and that Wardens Hudson and Rivers knew of such policy, and either approved of this policy or allowed it to continue, giving the policy tacit approval, knowing the consequences would be that inmates at Thomson would not get the proper medical care necessary, and that their injuries by staff and inmates would not be documented, which would only embolden staff and inmates to commit further violence on inmates.

169.     Saba was not moved until early April, despite requests by the Plaintiff, the Plaintiff's lawyer, Richard Dvorak, and the Plaintiff's wife that Saba be moved from the cell.

170.     These requests were directed at the Warden, which by this time would have been Warden Rivers, who, upon information and belief, took over from Warden Hudson in January of 2020.

171.     Had these requests been taken seriously from the beginning, at least some of these physical assaults would not have occurred.

172.     Eventually, in early April, Saba was removed as the Plaintiff's cellmate.

## The Plaintiff was Terrorized and Assaulted by Cellmate Dietz

173.     The Plaintiff made a request to a lieutenant that his new cellmate be an inmate named Joshua Davis, who had told the Plaintiff he would not give him any problems.

174.     The Plaintiff understands that prisoners do not get to choose their cellmates. However, due to the fact that Officer Maybury poisoned the entire unit by notifying all of the prisoners the Plaintiff was a "cho mo," finding a cellmate who would not beat or threaten the Plaintiff was a difficult task, and thus this request should have been granted.

175.     Instead, the prison moved into the Plaintiff's cell a former Florida police officer. The Plaintiff was with him for a couple of weeks. Upon information, his last name was Dietz.

176.     High ranking prison staff knew that Dietz had a history of being violent toward his cellmates.

177.     The decision by the prison staff to move Dietz into the Plaintiff's cell, rather than Davis, was reckless, given the fact that not only was Dietz known to be dangerous to his cellmates, but that finding an inmate willing to live with the Plaintiff even though the entire living unit, including Dietz, was put

on notice by Officer Maybury that the Plaintiff was a "cho mo," was almost impossible.

178.	It was a miracle that the Plaintiff found an inmate willing to be his cellmate, despite being on notice of being an alleged "cho mo," and yet this simple request was refused for no valid reason other than to demonstrate to the Plaintiff that he was not in charge of who he gets to share cells with.

179.	For the next two weeks, predictably, due at least in part to Dietz being told by Maybury that the Plaintiff was a "cho mo," the Plaintiff was terrorized by Dietz, including enduring constant serious threats, and this eventually led to Dietz attacking the Plaintiff and throwing blood at him.

180.	This attacked occurred in April of 2020. Before the attack became physical, though, Dietz himself called over a correctional officer, and this correctional officer saw that Dietz was acting out of control. Dietz asked this correctional officer to be cuffed and taken out of the cell, and the Plaintiff looked at the correctional officer as if to plead for help, but this correctional officer simply walked away.

181.	Predictably, as soon as the correctional officer walked away, Dietz attacked the Plaintiff, and threw blood on him that he was saving up in his cell.

**Top-Level Prison Officials within the Bureau of Prisons and at Thomson Have Recklessly Endangered the life of the Plaintiff and other prisoners at Thomson.**

182.     Thomson is a severely troubled institution that engages in a pattern and practice of routinely and systematically violating the Constitutional rights of the inmates in its care.

183.     The genesis of this trouble can be traced back to the very origins of the prison.

184.     High-ranking BOP officials were notice for years of the systematic violation of prisoners' rights at the Special Management Unit of USP Lewisburg in Lewisburg, Pennsylvania.

185.     This prison was the subject of numerous internal complaints and lawsuits, and both an Inspector General's Report as well as an independent prison watch-dog groups found the prison systematically engaged in civil rights abuses, including the improper use of restraints, including the improper use of four-point restraints.

186.     Despite these findings and spate of complaints and civil rights lawsuits, the BOP refused to change its unconstitutional and illegal practices, and instead merely exported the systematic abuse of prisoners from Pennsylvania to Illinois.

187.     The BOP announced in June of 2018 that its Lewisburg SMU would be moved to a "state of the art maximum-security prison" in Thomson, Illinois.

188.     The BOP purchased the facility from the state of Illinois in 2012.

189.     The prison was originally set to be used to house prisoners from Guantanamo Bay, but Congress blocked this from occurring.

190.     Warden Hudson was appointed the Thomson warden in 2014, but the SMU was not operational until January of 2019.

191.     During this time period, upon information and belief, Hudson was an associate warden in charge of the SMU in Lewisburg.

192.     Nothing changed about the SMU model or how the BOP operates the Unit when the SMU was transferred from Pennsylvania to Illinois.

193.     It is the SMU model—not its location—that was the problem, and high-ranking BOP officials, including Warden Hudson, knew this was the case, yet Warden Hudson continued to run the abusive unit in the same manner he ran the SMU in Lewisburg, without changes in the way it operated at Thomson.

194.     One major problem that exists at Thomson is the practice known as double-celling, a practice that it exported from Lewisburg, despite being on notice of the problematic nature of this practice.

195.     Double-celling at the SMU in Lewisburg led to fights, attacks and even deaths. From 2008 until July 2011, Lewisburg's SMU had 272 reported incidents of violence.

196.     Between 2010 and 2017, at least four men at Lewisburg were killed by their cellmates.

197.     To be clear, the practice of double-celling itself is not per se unconstitutional.  However, Warden Hudson knew that double-celling in a unit filled with a combination of dangerous individuals and vulnerable ones

was leading to systematic violence at USP Lewisburg, yet he continued the practice anyway, and exported this practice to USP Thomson, and those same problems occurred there as well.

198.     Despite being on notice that the practice of double-celling in a unit known for violent inmates, including inmates that routinely attack their cellmates, the practice continued at Thomson, and this practice implemented by Warden Hudson and continued by Warden Rivers was a proximate cause of the injuries suffered by the Plaintiff.

199.     USP Thomson, like USP Lewisburg, has also experienced numerous instances of violence, as well as inmate-on-inmate violence that has led to several in-custody deaths at Thomson.

200.     On March 5, 2020, Thomson inmate Matthew Phillips was beaten to death by an inmate.

201.     On November 27, 2020, Thomson inmate Edsel Aaron Badoni was beaten to death by an inmate.

202.     On December 3, 2020, Thomson inmate Boyd Weekly was beaten to death by an inmate.

203.     On December 18, 2020, Thomson inmate Patrick Bacon was beaten to death by an inmate.

204.     On February 28, 2021, Thomson inmate Shay Pinary was beaten to death by an inmate.

205.     It is believed that all five beating deaths were by cellmates.

206. Five deaths at one federal prison in roughly one year should have set off alarm bells for Warden Rivers yet he did nothing to address the fix the problem. To be sure, four of these five deaths occurred after the incidents described in this complaint, but this refusal to implement changes is relevant to the deliberate indifference displayed by Warden Rivers and evidences the serious consequences that can and did occur when no action is taken to address these serious problems.

207. According to an article in the Chicago Sun-Times, federal statistics show 160 federal prisoners were killed between 2001 and 2016, an average of 10.6 deaths per year throughout the federal system, which has 106 facilities.

208. Thomson having five beating deaths in one year is far beyond the norm, and far beyond acceptable.

209. Of course, this practice is even more intolerable when the prison allows its officials to exacerbate the double-celling problem by announcing that certain inmates are "cho mos," encouraging violence between cellmates, by refusing to move cellmates when the officers are put on notice of specific threats, by routinely using excessive force and even torture to retaliate against inmates who complain about threats to their safety or seek medical treatment, and the systematic failure to document and treat injuries without the approval of a correctional staff supervisor, all policies and practices that were implemented, approved, and/or condoned by Wardens Hudson and Rivers.

210. This systematic persistence to refuse to address the violence among cellmates is also exacerbated when, for example, prison officials are put on notice of a sexual assault, and has physical semen to prove the assault, yet prison officials refuses to even investigate the sexual assault, thus encouraging more violence, including sexual assault.

211. As stated above, prison officials at Thomson are in physical possession of the Plaintiff's underwear with Ponce's semen likely on it, and, upon information and belief this evidence has not even been tested for DNA, and no investigation whatsoever was done to investigate the Plaintiff's well-documented complaint of sexual assault.

212. This practice of condoning violence among cellmates and violence by guards against inmates is also exacerbated by having an official or unofficial policy of requiring high-ranking prison staff to approve of nurses documenting injuries.

213. This practice not only encourages violence by guards and by cellmates, but it also is a significant impediment to getting proper medical care.

## COUNT I – *BIVENS* ACTION
## EXCESSIVE FORCE/FAILURE TO INTERVENE TO PREVENT EXCESSIVE FORCE/SUPERVISORY LIABLITY
## PLAINTIFF V. DEFENDANTS K. MAYBURY, D. CRUZE, T. ALBERTSON, LT. BRULHE, OFFICER JENKINS, WARDEN HUDSON, WARDEN RIVERS

214. Each paragraph of this complaint is referenced and reinstated in articulating the basis for this count.

215.     As described above, Defendants K. Maybury, D. Cruze, T. Albertson, Lt. Brulhe and Officer Jenkins all knowingly and/or intentionally and/or recklessly participated in the brutal use of excessive force and/or knowingly, intentionally and/or recklessly failed to intervene to prevent such use of excessive force, in violation of the Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

216.     Lt. Brulhe is also sued on the basis of supervisory liability for condoning and/or turning a blind eye to the excessive use of force against the Plaintiff based on the personal, in-person excessive force interactions with the Plaintiff described in this complaint.

217.     Wardens Hudson and Rivers are sued in their individual capacities for their personal actions in developing, implementing and continuing to use policies and practices at Thomson that they knew were leading to violence against inmates by correctional staff, including but not limited to their knowledge of the use of a torture chamber in its facility that systematically violated the Eighth Amendment rights of inmates.

218.     As a result of the above-described wrongful infringement of the Plaintiff's rights, they suffered damages including, but not limited to severe physical and emotional damages.

### COUNT II – *BIVENS* ACTION
### DELIBERATE INDIFFERENCE TO SERIOUS RISK OF INMATE ON INMATE VIOLENCE/SUPERVISORY LIABLITY
### PLAINTIFF V. DEFENDANTS K. MAYBURY, D. CRUZE, LT. BRULHE, WARDEN HUDSON, WARDEN RIVERS

219.     Each paragraph of this complaint is referenced and reinstated in articulating the basis for this count.

220.     As described above, Defendants K. Maybury, D. Cruze, and Lt. Brulhe all knowingly and/or intentionally and/or recklessly failed to address the serious safety needs of the Plaintiff, in that they either took actions to recklessly endanger the life and safety of the Plaintiff, or were aware of the serious risk to the Plaintiff of inmate violence, and yet did nothing to prevent such violence from occurring, in violation of the Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

221.     Lt. Brulhe is also sued on the basis of supervisory liability for condoning and/or turning a blind eye to risks to the Plaintiff of inmate violence, including but not limited to his refusal to allow the Plaintiff's injuries to be treated and documented, which he knew would lead to further inmate on inmate violence.

222.     Wardens Hudson and Rivers are sued in their individual capacities for their personal actions in developing, implementing and continuing to use policies and practices at Thomson that they knew were leading to violence against inmates by other inmates, including but not limited to their knowledge of the use of double celling in the face of evidence that this practice was causing inmate violence, as well as their knowledge that inmate on inmate violence was not being properly treated and documented, thus encouraging more inmate on inmate violence.

223.     As a result of the above-described wrongful infringement of the Plaintiff's rights, they suffered damages including, but not limited to severe physical and emotional damages.

## COUNT III – *BIVENS* ACTION
## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
## PLAINTIFF V. ALL DEFENDANTS

224.     Each paragraph of this complaint is referenced and reinstated in articulating the basis for this count.

225.     As described above, Defendants all knowingly and/or intentionally and/or recklessly failed to address the serious medical, including psychological, needs of the Plaintiff, in violation of the Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

226.     Lt. Brulhe is also sued on the basis of supervisory liability for condoning and/or turning a blind eye to the failure to address the serious medical, including psychological needs, of the Plaintiff and for further interfering to prevent the treatment and documentation of the Plaintiff's need for medical treatment.

227.     Wardens Hudson and Rivers are sued in their individual capacities for their personal actions in developing, implementing and continuing to use policies and practices at Thomson that they knew were leading to the denial of treatment for the serious medical, including psychological, needs of inmates, including but not limited to their knowledge that inmates' injuries were not being properly documented and treated because of interference with medical

care by correctional staff, as well as of the use a four-point restraints in a manner in which they knew inmates were systematically being denied treatment for serious physical and psychological needs while placed in this cruel and unusual technique that they knew was being misused and that they knew were resulting in serious, prolonged, denial of medical and mental health care during these prolonged torture sessions.

228.    As a result of the above-described wrongful infringement of the Plaintiff's rights, they suffered damages including, but not limited to severe physical and emotional damages

## Request for Relief

The Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against the Defendants, award compensatory and punitive damages and attorneys' fees and costs against all Defendants. The Plaintiff also seeks declaratory, injunctive, or other equitable relief that this Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully Submitted,

/s/ Richard Dvorak
One of the Attorneys
for the Plaintiff

Richard Dvorak
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527

(312) 593-7146
Richard.dvorak@civilrightsdefenders.com